**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLORADO
Chief Judge Marcia S. Krieger**

**Civil Action No. 13-cv-01287-MSK-MJW**

**JOHN DOE;
JANE DOE;
E.C., by her parents and next friends;
E.S.C., by his parents and next friends; and
J.C., by his parents and next friends,**

        **Plaintiffs,**

**v.**

**JOANNA MCAFEE,
LISA LITTLE,
JOEY HARRIS,
JON PRICE,
MITCHELL MIHALKO, and
CHAD HAYNES,**

        **Defendants.**

_____

**OPINION AND ORDER GRANTING MOTION FOR ATTORNEY FEES AND
OVERRULING OBJECTIONS**
_____

        **THIS MATTER** comes before the Court pursuant to former Defendants Jonathan

Hudson and Andrew Romano's Motion for Attorney Fees (**# 103**), the Plaintiffs' response

(**#104**), and Mr. Hudson and Mr. Romano's reply (**# 112**); the Plaintiffs' Objections (**# 119**) to

the Magistrate Judge's April 21, 2015 Minute Order (**# 114**) granting the Defendants' Motion to

Compel Plaintiffs Jane and John Doe's attendance at a deposition in Colorado (**# 105**), the

Defendants' response (**# 124**), and the Plaintiffs' reply (**# 128**); the Plaintiffs' Objections (**# 123**)

to the Magistrate Judge's May 7, 2015 Minute Order (**# 122**) denying the Plaintiffs' Motion for

Reconsideration (**# 118**) of the April 15 deposition order, the Defendants' response (**# 126**), and

the Plaintiffs' reply (# 128); the Plaintiffs' Objections (# 142) to the Magistrate Judge's May 18,

2015 Minute Order (# 132) denying the Plaintiffs' Motion for Protective Order (# 117), the

Defendants' response (# 144, 146), and the Plaintiffs' reply (# 148); and the Plaintiffs' Motion to

Stay (# 164), and the Defendants' response (# 168).

## FACTS

The Court briefly recites the pertinent facts herein and elaborates in the appropriate

portion of its analysis.  The Plaintiffs, John and Jane Doe, are the parents of the four minor

Plaintiff children.  In 2012, the El Paso County Department of Human Services ("DHS") sought

to investigate allegations that the Does had physically abused their child Y.C.   Defendant

McAfee, on behalf of DHS, visited the Plaintiffs to interview them and requested, among other

things, to photograph the alleged injuries to Y.C.'s buttocks.  The Does and Y.C. resisted Ms.

McAfee's request that Y.C. reveal her buttocks to be photographed.  The situation escalated to

the point that Ms. McAfeee called local police to assist, Jane Doe and Y.C. got in a car and left

Colorado, and Ms. McAfee then sought and obtained an order allowing DHS to take the Does'

remaining children into protective custody.  Before Ms. McAfee was able to take the remaining

children into custody, Mr. Doe (allegedly unaware of the existence of the custody order) drove

the children to North Carolina.  Eventually, the children were returned to Colorado, the parties

reached an agreement by which the Does would retain custody of their children, and Mr. Doe

pled guilty to a misdemeanor count of child abuse (despite having been charged with various

felonies related to these events).

The Plaintiffs commenced this action alleging twelve nominal claims under 42 U.S.C. §

1983 against some 18 Defendants.  In an Opinion and Order (# 91) dated September 29, 2014,

this Court granted motions to dismiss brought by various Defendants in part or whole, trimming

the case down to four primary claims: (i) First Amendment retaliation by Plaintiffs John and Jane Doe against Defendants McAfee, Little, Harris, and Price, in that these Defendants sought to obtain custody of the Does' remaining children because of the Does' protected First Amendment expression opposing Ms. McAfee's request to photograph Y.C.'s injuries; (ii) a claim of deprivation of Substantive Due Process by the Does, E.C., J.C., and E.S.C against the same four Defendants, in that the Defendants' efforts to obtain custody over the Does' children other than Y.C. were undertaken without cause and with an intent to interfere with the Plaintiffs' fundamental rights to parental custody and control; (iii) a claim of Fourth Amendment violations by Defendant McAfee by Plaintiffs E.C., J.C., and E.S.C., arising out of Ms. McAfee's inducing North Carolina authorities to take the Plaintiff children into custody on the basis of an arguably defective custody order; and (iv) retaliatory prosecution by Plaintiff John Doe against Defendants Mihalko and Haynes, based on their decisions to file criminal charges against him in retaliation for his engaging in First Amendment activity.  The remaining claims against the remaining Defendants were dismissed for failure to state a claim.

In the instant motions, former Defendants Hudson and Romano move for an award of attorney fees **(# 103)** against the Plaintiffs pursuant to 42 U.S.C. § 1988, arguing that the Plaintiffs' claims against them were frivolous, groundless, unreasonable, or without foundation.

The Plaintiffs also have filed a series of objections to non-dispositive rulings by the Magistrate Judge pursuant to Fed. R. Civ. P. 72(a).  The primary focus of these Objections is the Defendants' desire to take depositions of Plaintiffs John and Jane Doe in Colorado as compared to South Carolina.  Stating that they "are terrified of what County personnel will do next," the Does refused to appear for depositions in Colorado ("or anywhere close") and insisted that the depositions take place in South Carolina, where they currently reside.  The Defendants moved to

compel (**# 105**) the Does to appear for deposition in Colorado and the Magistrate Judge granted (**# 114**) that motion.  The Does simultaneously requested that the Magistrate Judge reconsider that order (**# 118**) and filed Rule 72(a) Objections (**# 119**) to the order to this Court.  The Magistrate Judge denied (**# 122**) the motion to reconsider and the Plaintiffs filed Rule 72(a) Objections (**# 123**) to that ruling as well.

Thereafter, the Defendants noticed the Plaintiff children for depositions in Colorado. Citing concerns that "their depositions need[ ] to be limited . . . to minimize any associated trauma," the Plaintiffs moved for a protective order (**# 117**) to prevent the depositions from occurring (and from occurring at all in Colorado) until the Plaintiffs could retain "a psychological trauma expert" to evaluate the children and suggest accommodations that should be observed for the depositions.  Finding no concrete showing of potential harm, the Magistrate Judge denied (**# 122**) that motion, and the Plaintiffs again filed Rule 72(a) Objections (**# 123**) to that ruling.  (The Magistrate Judge subsequently issued a second Minute Order (**# 132**), again denying the Plaintiffs' Motion for Protective Order, and the Plaintiffs filed Rule 72(a) Objections (**# 142**) to that Minute Order as well.)  Finally, on June 5, 2015, the Plaintiffs filed a Motion to Stay (**# 164**) the effect of the Magistrate Judge's orders requiring them to appear for deposition until their Objections were resolved (although it does not appear from the motion that those depositions were scheduled, much less imminent).

## ANALYSIS

### A.  Motion for Attorney Fees

All claims against former Defendants Hudson and Romano have been dismissed.  They now seek an award of attorney fees pursuant to 42 U.S.C. § 1988.  42 U.S.C. § 1988(b) provides that, in actions under 42 U.S.C. § 1983, "the court, in its discretion, may allow the prevailing

party . . . a reasonable attorney's fee as part of the costs."  The court may make such an award to a prevailing <u>defendant</u> "upon a finding that the plaintiff's action was frivolous, unreasonable, or without foundation, even though not brought in subjective bad faith."  *D.A. Osguthorpe Family Partnership v. ASC Utah, Inc.*, 576 Fed.Appx. 759, 763 (10th Cir. 2014) (unpublished), *citing Christiansburg Garment Co. v. EEOC*, 434 U.S. 412, 421 (1978).  A complaint is "frivolous" when it "lacks an arguable basis in either fact or law."  *Blakely v. USAA Cas. Ins. Co.*, 633 F.3d 944, 949-50 (10th Cir. 2011).

The Third Amended Complaint (**# 45**) made the following substantive allegations regarding Mr. Hudson and Mr. Romano's actions:

> [Ms. McAfee appeared at the Plaintiffs' home and requested that Y.C. consent to have her buttocks photographed.  Y.C. refused the request, Ms. McAfee appealed to the Does to convince Y.C. to comply, and the Does refused.  Ms. McAfee then called the police.]

> 66.  Officer Andrew Romano and Officer Jonathan Hudson of the Monument Police Department arrived . . . Ms. McAfee discussed the situation with the officers.

> 67.  When the officers arrived, they patted down [John Doe] and took away his pocket knife.

> 68. The officers failed to intervene in the attempted strip search, but also talked to [John Doe] in an effort to convince him to order his daughter to strip for the examination and photographs.

> . . .

> 72.  Both sets of law enforcement [Mr. Hudson and Mr. Romano, and members of the El Paso County Sheriff's Department who also arrived at the scene] talked to [John Doe] and were present for some time.  Both sets failed to intervene with the unconstitutional search.

> . . .

83.  When Ms. McAfee and the police deputies[1] continued to lecture, harangue, and bully [John Doe], which he believed was in violation of his constitutional rights, he lay down in the driveway in a non-threatening position and covered his face with his hat, as a form of expressive conduct and protest.

84.  [John Doe] stayed outside, fearing what would happen if he went inside out of sight of the police.  He declined to allow the police to search the house without a warrant.

85.  Ms. McAfee discussed the situation and her plans with the law enforcement present, as well as making numerous phone calls.

. . .

90.  The Monument officers placed [John Doe's] pocket knife on the seat of his car.  Then [he] left.

This reflects the entirety of the allegations concerning Mr. Hudson and Mr. Romano.  Based on these allegations, the Plaintiffs asserted six separate claims against Mr. Husdon and Mr. Romano:

• Claim One asserted that Mr. Hudson and Mr. Romano violated Y.C.'s Fourth Amendment rights, in that they "attempted to coerce [John Doe] to order his daughter to consent, and failed to intercede for the Does."  That claim further states "police involvement to compel consent to viewing and photographing private body parts, and to overbear the parents' and child's will, is constitutionally coercive and improper" and that "law enforcement failure to intervene to protect constitutional rights of citizens from infringement by other government officials is also constitutionally improper."  It also contends that "Ms. McAfee discussed with all law enforcement present her intention to seek a custody order on Y.C. and her siblings, despite the fact that they were not in danger."  It alleges that "by lending their uniformed, armed presence during the entire encounter, law enforcement participated in and endorsed the unconstitutional conduct.  Again, they failed to intervene."

---

[1]      It is unclear whether, by "police deputies," the Plaintiffs are referring to the Monument Police Officers (Mr. Hudson and Mr. Romano), the El Paso County Sheriff's Department deputies on the scene, both, or neither.

• Claim Two alleged that Mr. Hudson and Mr. Romano violated Y.C.'s Fourteenth Amendment right to privacy "in the naked body." It alleges that Y.C. "faced an unconstitutional invasion of her privacy when a government agent, Ms. McAfee, demanded that she expose her private parts for viewing and photography" and that Mr. Hudson and Mr. Romano "encouraged Ms. McAfee in her conduct and also attempted to coerce cooperation from Y.C.'s father." In addition, it repeats the same "failure to intervene" theory referenced in Claim One.

• Claim Four alleged that Mr. Hudson and Mr. Romano violated John Doe's First Amendment rights. he contends that he was engaged in constitutionally protected activity "when he refused to compel his daughter to submit to an unconstitutional strip search." He states that he was "harangued and bullied by four armed, uniformed law enforcement officers" and that such conduct "would chill a person of ordinary firmness from continuing to engage in their exercise of their constitutional rights."

• Claim Seven alleged that Mr. Hudson and Mr. Romano violated the Does' Fourteenth Amendment liberty interests in familial association and their right to privacy in that Ms. McAfee (or others) made "retaliatory threats . . . that a child will be taken into protective custody if the parent does not comply with an unconstitutional order" and that "Law enforcement failure to intervene to protect constitutional rights of citizens from infringement by other government officials is also constitutionally improper."

• Claim Eight asserts claims similar those of Claim Seven, except on behalf of Plaintiffs E.C., E.S.C., and J.C. The basis of the claim against Mr. Hudson and Mr. Romano are again limited to failure to intervene.

• Claim Nine asserts Fourth Amendment claims by E.C., E.S.C., and J.C. arising out of Ms. McAfee obtaining an allegedly defective custody order and using it to briefly take custody of them at their school. Although Mr. Hudson and Mr. Romano were not present during this incident and are not described within the body of the claim with any degree of specificity, they are nevertheless named in the claim. The most charitable reading of the Third Amended Complaint for the Plaintiffs in this regard would require construing paragraph 201 in Claim One – "Ms. McAfee discussed with all law enforcement present her intention to seek a custody order on [E.C., E.S.C., and J.C.], despite the fact that they were not

in danger" – into Claim Nine as well, such that Mr. Hudson and
Mr. Romano were allegedly aware of her intentions.

This Court agrees with Mr. Hudson and Mr. Romano that the claims asserted against
them, at least on the face of the Third Amended Complaint, were "frivolous," in the sense of
"lacking an arguable basis in either fact or law."  Factually, the only well-pled allegations
involving Mr. Hudson and Mr. Romano are that they arrived on the scene, spoke with Ms.
McAfee about the issue, and spoke to John Doe in an attempt to convince him to have Y.C.
consent to the search.  (Although the Plaintiffs include additional conclusory allegations – that
Mr. Hudson and Mr. Romano "lecture[d], harangue[d], and bull[ied]" Mr. Doe – such
conclusions are untethered to any well-pled factual assertions describing such conduct and are
thus irrelevant.)  There can be no reasonable argument that such conduct is sufficient to state any
direct constitutional claim against Mr. Hudson and Mr. Romano.

Nor do such allegations, without more, begin to state a colorable claim for a
constitutional violation under a failure to intervene theory.  It is well-recognized that "all law
enforcement officials have an affirmative duty to intervene to protect the constitutional rights of
citizens from infringement by other law enforcement officers in their presence."  *Vondrak v. City
of Las Cruces*, 535 F.3d 1198, 1210 (10th Cir. 2008), *citing Anderson v. Branen*, 17 F.3d 552,
557 (2d Cir. 1994).   To adequately allege such a claim, a plaintiff must assert facts that would
show: (i) the officer "observe[d] or has reason to know . . . that any constitutional violation [was
being committed] by a law enforcement official"; and (ii) that the officer had "a realistic
opportunity to intervene to prevent the harm from occurring."  *Id.*  However, none of the
allegations in the Third Amended Complaint arguably begin to approach such a claim for
numerous reasons.

First, as described by the 10th Circuit, the theory applies only when a law enforcement officer is cognizant of constitutional violations being committed by <u>another law enforcement officer</u>.  It is by no means clear that Ms. McAfee, as a representative of the DHS, could reasonably be considered to be a "law enforcement officer," nor did the Plaintiffs ever cite to authority suggesting that the theory should be broadened to apply to constitutional violations committed outside the law enforcement context.

Second, the doctrine applies only to situations in which the law enforcement officer affirmatively observes the illegal conduct or has reason to know that it is being or is about to be committed.  Here, the only conduct by Ms. McAfee that can arguably be considered to be unconstitutional is her decision to obtain a custody order over E.C., E.S.C, and J.C., and she did so only after her interactions with Mr. Hudson and Mr. Romano had concluded.  Nothing in the Third Amended Complaint even arguably permits an inference that Mr. Hudson and Mr. Romano should have recognized that such an action would be unconstitutional.  Paragraph 85 of the Third Amended Complaint alleges, in somewhat conclusory terms, that Ms. McAfee "discussed the situation and her plans with the law enforcement present."  A reasonable inference to be drawn from this allegation might be that Ms. McAfee advised Mr. Hudson and Mr. Romano that she planned to seek a custody order for E.C., E.S.C., and J.C.  But the mere fact that Ms. McAfee announced her intention to do so is insufficient to allege that Mr. Hudson and Mr. Romano thus understood that seeking such an order would be an unconstitutional act in itself.  To get to that point, the Plaintiffs would have to further allege that Ms. McAfee  either confessed to Mr. Hudson and Mr. Romano that she had no colorable basis to seek such an order but that she was going to do so anyway, or that Mr. Hudson and Mr. Romano somehow possessed a sufficient understanding of domestic relations law that they would have recognized,

based on the information that Ms. McAfee had conveyed to them (information that the Third Amended Complaint does not describe), that such information would be insufficient to obtain such a custody order.[2]  Obviously, nothing in the Third Amended Complaint begins to make such an allegation, nor do the Plaintiffs contend now that they could have made such an assertion.

Third, the theory requires Mr. Hudson and Mr. Romano to have had an adequate opportunity to intervene in order to prevent the unconstitutional act.  The Plaintiffs offer no explanation as to how they could have accomplished that intervention here.  There is no allegation that Mr. Hudson and Mr. Romano had the legal authority to prevent Ms. McAfee from seeking a custody order for the other children, or that they had immediate access to speak to Ms. McAfee's supervisor or some other person with such authority and request that person to exercise their authority to restrain Ms. McAfee.  (Nor is there authority that the failure to seek out a supervisor and plead for that person to intervene to halt an imminent constitutional violation is the type of non-intervention that can give rise to constitutional liability.) Nothing in the Third Amended Complaint alleges that Ms. McAfee's phone call to the judge to obtain the custody order occurred in Mr. Hudson and Mr. Romano's presence, such that they might even have been privy to the details of that call and capable of stopping Ms. McAfee from making the request.

---

[2]      Even so, the Plaintiffs' allegations are not that Ms. McAfee merely seeking the custody order is the unconstitutional act.  Rather, the Plaintiffs' allegations are that Ms. McAfee obtained the order improperly by concealing pertinent information from the judge who issued the order.  Thus, for Mr. Hudson and Mr. Romano to be liable for failing to intervene to prevent such an occurrence, the Plaintiffs would have to show that Mr. Hudson and Mr. Romano were privy to Ms. McAfee's intention to misrepresent the matter to the issuing judge.  This is yet another factual layer removing Mr. Hudson and Mr. Romano from the allegedly unconstitutional act they are accused of abetting.

In short, the Plaintiffs' claims against Mr. Hudson and Mr. Romano are both factually- and legally-deficient in a variety of ways, to the point that the Court is comfortable in finding that no reasonable attorney could have genuinely believed that such allegations were sufficient to state colorable constitutional claims against them. It appears that the claims were asserted not out of any careful consideration of factual and legal analysis, but rather, out of a shotgun approach of simply naming each and every public official that came into contact with any of the Plaintiffs at any point in time pertinent to a given claim.   Although the Court does not find that the Plaintiffs or their counsel acted in subjective bad faith in bringing claims against Mr. Hudson and Mr. Romano, the Court finds that the claims that were pled were patently without arguable justification such that they were frivolous and utterly lacking in foundation.  Thus, the Court agrees with Mr. Hudson and Mr. Romano that an award of attorney fees in their favor under 42 U.S.C. §1988(b) is warranted.

The next question is what amount of fees should be awarded.  As with all fee awards, the Court addresses this question be engaging in the familiar "lodestar" analysis, multiplying the reasonable hours spent on the compensable tasks by a reasonable hourly rate, and then adjusting that figure upwards or downwards only in exceptional circumstances.  *See generally Gisbrecht v. Barnhart,* 535 U.S. 789, 801–02 (2002).  The movant – Mr. Hudson and Mr. Romano – bear the burden of proving the reasonableness of the rates and hours claimed.  *Mares v. Credit Bureau of Raton*, 801 F.2d 1197, 1201 (10th Cir.1986).

Mr. Hudson and Mr. Romano seek attorney fees totaling $ 23,399.00 for work performed in this case.  They claim hourly rates of between $ 160-$ 185 for attorney time and $ 85 per hour for paralegal time.  They submit billing records describing the tasks performed, although such

records specifically identify only one of the three counsel who worked on this matter – Ms. Fahlsing – by name.

The Plaintiffs did not specifically respond to the rates and hours claimed by Mr. Hudson and Mr. Romano. The Plaintiffs elected to devote their response to arguing that no fees should be awarded. Only in the Prayer in their response do they state "if the motion to dismiss [sic] is denied, give Plaintiffs an opportunity to oppose the motion for attorney's fees on the merits." The Plaintiffs do not explain why they were somehow unable to address the particular rates and hours claimed by Mr. Hudson and Mr. Romano at the time they filed their response. There being no explanation for why such opposition could not have been included in the Plaintiffs' response, the Court deems the Plaintiffs to have waived the opportunity to challenge the rates and hours claimed by Mr. Hudson and Mr. Romano.

Nevertheless, the Court finds, on its own review, that some reduction in the amount claimed by Mr. Hudson and Mr. Romano is appropriate. Several of the time entries are unreasonable or unnecessary to the defense of the case. In many instances, Mr. Hudson and Mr. Romano's counsel make individual time entries for "receiv[ing] and review[ing]" multiple e-mails received in a single day. For example, on August 5, 2013, Ms. Fahlsing made seven separate entries for .1 hour each for receiving and reviewing individual e-mails from opposing counsel or co-defendants concerning various matters in the case. She made four more .1 hour entries for receiving more e-mails the following day. (These entries are distinct from several additional time entries on these days for receiving and reviewing actual filings in this case by other parties or orders from the Court.) Although such reviewing such e-mails may be

compensable time,[3] separating each event into a separate billing entry has the effect of

magnifying the actual time spent on these tasks due to the lack of granularity in a decimal billing

system.  In other words, although receiving and reviewing these 11 e-mails over two days might

have cumulatively accounted for no more than 10 minutes of Ms. Fahlsing's actual time

(notably, the billing records do not record time billed by Ms. Fahlsing for responding to any of

these e-mails), billing each event separately allows more than an hour of time to be claimed for

such tasks.  Similarly, Ms. Fahlsing often breaks up a day's worth of work on the case into

multiple entries of relatively small amounts of time.  For example, in addition to the time entries

for e-mails on August 6, 2013, Ms. Fahlsing made four more separate time entries on that day,

each for .2 to .4 hours, for tasks such as "work on proposed scheduling order," "work on initial

disclosures," "work on defendants' joint motion to stay discovery," and "receive and review

County Defendants' initial disclosures."  Once again, due to decimal timekeeping and rounding

off, multiple time entries in a single day have the effect of magnifying the actual hours spent on

case-related tasks.  Some reduction in the number of hours claimed is necessary to offset this

practice.  The Court finds it impractical to attempt to make such a reduction on an item-by-item

basis, and instead, elects to excise such unnecessary time by means of a wholesale reduction.

Because the bulk of the entire time record on this case consists primarily of these types of small

time increments, the Court finds that a wholesale reduction of 10% of the amount claimed by Mr.

---

[3]      The Court has mild reservations about attorneys billing time for reviewing literally every
communication that may be received regarding a case.  For example, on July 29, 2013, Ms.
Fahlsing billed .1 hours for "Receive and review electronic notice that Judge Krieger is referring
county defendant's motion to dismiss to Magistrate for ruling."  Although it is certainly
important for counsel to remain apprised of the status of each aspect of the case, such miniscule
expenditures of time that confer no particular benefit on the client are the type that most law
firms would either write off as non-billable or simply omit from timekeeping as a matter of
practicality.  The Court suspects that it took longer for Ms. Fahlsing to make the time entry for
this item than it did for her to actually read the electronic notice.

Hudson and Mr. Romano is sufficient to excise any unnecessary hours resulting from this practce.

The Court also finds that several hours were spent by counsel considering and responding to a Colorado Open Records Act ("CORA") request made by the Plaintiffs to the Town of Monument.  Although the CORA request was very likely related to the Plaintiffs' claims, such requests are directed at state agencies and institutions, not individuals like Mr. Hudson and Mr. Romano.  Thus, they may not personally recover from the Plaintiffs the costs of attorney time expended by their employer or some other agency in responding to such a request.  The billing entries that mention the CORA request comprise a total of $ 2,564.50, although many of those entries reflect both CORA and non-CORA related work.  The Court finds that a reduction of $1,500 in the amount claimed by Mr. Hudson and Mr. Romano is sufficient to exclude time spent by counsel on the CORA request.

Accordingly, the Court calculates the lodestar figure as ($ 23,399 - $ 1,500) * .9 = $19,709.00.  The Court finds no basis for adjustments to this figure in either direction and further finds that this amount is within the range of reasonableness given the tasks performed by counsel in seeking the dismissal of the frivolous claims asserted against Mr. Hudson and Mr. Romano. Accordingly, the Court grants Mr. Hudson and Mr. Romano's motion and directs that the Plaintiffs pay them a total of $ 19,709.00 in attorney fees pursuant to 42 U.S.C. § 1988(b).

### B.  Rule 72(a) Objections

The Magistrate Judge's ruling on the Plaintiffs' various motions relating to the location of their depositions are non-dispositive matters that this Court reviews under Fed. R. Civ. P. 72(a).  The Court will be reversed only if they are "clearly erroneous or contrary to law."  28 U.S.C. § 636(b)(1)(A); *Hutchinson v. Pfeil*, 105 F.3d 562, 566 (10th Cir. 1997); *Ariza v. U.S.*

14

*West Communications, Inc.*, 167 F.R.D. 131, 133 (D. Colo. 1996).  Accordingly, the Plaintiff's Objections will be overruled unless the Court finds that the Magistrate Judge abused his discretion or, if after viewing the record as a whole, the Court is left with a "definite and firm conviction that a mistake has been made." *Ariza,* 167 F.R.D. at 133, *citing Ocelot Oil Corp. v. Sparrow Indus.,* 847 F.2d 1458, 1464 (10th Cir.1988).

The Magistrate Judge is vested with broad discretion in fixing the time and place of depositions, and that discretion is subject to reversal only where there is no rational basis in the evidence for the ruling.  *In re Standard Metals Corp.*, 817 F.2d 625, 628 (10th Cir. 1987).  A constellation of general rules of thumb guide such decisionmaking.  For example, there is a general rule that the party noticing the deposition– in this case, the Defendants– is entitled to designate the location.  *See O'Sullivan v. Rivera*, 229 F.R.D. 187, 189 (D.N.M. 2004).  At the same time, courts often conclude that, in the absence of exceptional or unusual circumstances, when a deponent resides a substantial distance from the deposing party's location, the Court will usually require the deposing party to take the deposition in a location near where the deponent resides.  *Id.*, *citing Metrex Research Corp. v. United States*, 151 F.R.D. 122, 125 (D.Colo.1993).  This rule applies even where the deponent is a party.  *Id.*  However, "because the Plaintiff has greater influence over the choice of forum, courts are more willing to protect the defendant from having to come to the forum for the taking of his or her deposition than they are in the case of plaintiffs." *Id.*, *citing* Wright & Miller, <u>Federal Practice and Procedure</u> § 2112 (1994).  Although the Plaintiffs find the most support for their position in *Metrex*, it, like the other cases cited, merely offer considerations that guide, but do not strictly control, the decision as to where depositions should take place.

Having considered all of the various motions and objections, the Court finds that the Magistrate Judge's decision requiring the Does to be deposed in Colorado is not clearly erroneous nor contrary to law.  Several of the rules of thumb discussed above favor the Does being deposed in Colorado: it is the location selected by the Defendants who noticed the deposition and it is the jurisdiction where the Plaintiffs previously resided and where they elected to file this action.  Although the Does would prefer to be deposed closer to their home state, their opposition to being deposed in Colorado does not stem from the typical reasons why a court might require the deposition to be held in the place of the deponent's residence – reasons such as the cost of travel and accommodations being an undue hardship on the deponent or the disruptions caused by such travel on the deponent's work or family obligations.  Rather, the Does' opposition to traveling to Colorado to be deposed is based solely on nebulous and speculative fears of "possible retaliation" that the Defendants might perpetrate against them if they return.  The Does acknowledge that such fears are entirely hypothetical, stating that they "cannot know for certain exactly what retaliation they may face if they were to enter the State," but they remain convinced that, simply because the Defendants retaliated against them previously, they will continue to do so.[4]  Were the Court to conclude that all that is necessary for a deponent to avoid a deposition in a given jurisdiction is to express some vague fear of unspecified "retaliation" that might result, the Court would surrender its ability to fix the place of depositions, allowing deponents to dictate where they are willing to appear. Because the Does have not articulated any legitimate reason for opposing the Defendants' noticing of their

---

[4]     The Does attempt to thread a tricky needle by acknowledging that they would be willing to return to Colorado for a trial in this matter, because "the County is less likely to violate legal rights under the eye of  a federal judge and jury."  The Does do not explain why they consider depositions to be somehow operating outside of this judicial "eye."

depositions for Colorado, the Court cannot say that the Magistrate Judge's decision to direct the depositions to take place in the jurisdiction selected by the Defendants and where the case is pending is clearly erroneous or contrary to law.

Thereafter, the Defendants also noticed the deposition of the Does' minor children to occur in Colorado as well, and the Does moved for a protective order quashing those notices. The grounds stated by the Does for preventing their children from being noticed for deposition in Colorado are slightly different: they contend that the children have suffered an "extraordinarily high" level of "trauma" as a result of the incidents at issue in this case and are concerned that being deposed in Colorado may result in some unspecified additional "trauma" or "decompensation."  Curiously, at the time of their Motion for Protective Order before the Magistrate Judge, the Plaintiffs do not purport to assert conclusively that such trauma will result; rather, their motion seeking to stay the depositions of the minor children also asks that the depositions be halted while the Plaintiffs retain an expert to opine as to whether such trauma might result.  In conjunction with the existing Rule 72(a) Objections, the Plaintiffs subsequently tendered a letter from Kristine Jacquin, a Clinical Psychologist (# 166).  Ms. Jacquin opines that "it is not in the best interests of the Doe children . . . to return to Colorado for depositions" because they "expressed high levels of anxiety and apprehension" about returning there and about "being removed from their parents' care if they were in Colorado."  She also opines that "it is not in the best interests of the Doe children . . . for their parents to return to Colorado for depositions" for essentially the same reasons.[5]

Once again, the Court cannot say that the Magistrate Judge's denial of the Plaintiffs' Motion for Protective Order was clearly erroneous or contrary to law.  Once again, the Plaintiffs

---

[5]    Ms. Jacquin's letter promises a more comprehensive report in the future.  To date, the Plaintiffs have not supplemented their motion with any such report.

have offered only generalized, speculative, and nebulous fears that returning the children to

Colorado to be deposed will cause them unspecified "trauma" or "decompensation."  They do

not articulate any concrete or tangible event that they reasonably expect to occur.  Although the

Court accepts the proposition that returning to Colorado to be deposed might cause the children

to suffer anxiety, the Court is not required to accommodate anxieties or fears that do not derive

from concrete, demonstrable causes.  The Does do not suggest any arrangement that might

mitigate such anxiety beyond insisting that the children be deposed in South Carolina.  For

example, to the extent that anticipated anxiety is related to the children's belief that they will be

removed from their parents, one might suppose that it could be somewhat mitigated by having

their parents present for the deposition, even though the deposition takes place in Colorado.

Once again, indulging such inherently abstract concerns and anxieties of a deponent would

require the Court to surrender its ability to control the discovery process, allowing any deponent

to cite their own irrational fears and anxieties as a basis to dictate where they wish to be deposed.

Although Ms. Jacquin's letter was not before the Magistrate Judge when he denied the

Motion for Protective Order, this Court will consider it, but finds that it adds little weight to the

Plaintiffs' argument.  Ms. Jacquin merely opines that "it is not in the best interests of the Doe

children" for themselves or their parents to be deposed in Colorado.  Arguably, it is not in the

best interests of the Doe children for them or their parents to be deposed at all, just as it is not in

the best interests of the children to turn over documents requested by the Defendants or to

answer interrogatories.  The question is not whether the children's "best interests" are served by

having depositions in Colorado or somewhere else or whether the children will find returning to

Colorado to be deposed to be an anxiety-producing experience.  The question is whether there is

a legitimate basis for believing that being deposed in Colorado, as opposed to in some other

location, is likely to cause the children to suffer actual psychological harm (as opposed to mere anxiety or temporary discomfort).  Ms. Jacquin's letter does not address that issue, and thus, the Court finds it to be of limited assistance in this matter.

Accordingly, the Court finds that the Magistrate Judge's denial of the Plaintiffs' Motion for Protective Order was not clearly erroneous or contrary to law.  Each of the Plaintiffs' Objections to the Magistrate Judge's orders are overruled[6] and the Plaintiffs' motion to stay depositions is denied.

## CONCLUSION

For the foregoing reasons, Mr. Hudson and Mr. Romano's Motion for Attorney Fees (**# 103**) is **GRANTED**.  The Plaintiffs shall pay Mr. Hudson and Mr. Romano's attorney fees in the amount of $ 19,709.00 within 30 days of this Order.  The Plaintiffs' Objections (**# 119, 123, 142**)

---

[6]      The Plaintiffs' May 26, 2015 Objections also make a highly abbreviated argument that the Magistrate Judge erred in his May 18, 2015 Order (**# 132**) granting the Defendants' Motion to Compel (**# 115**) the Plaintiffs to answer certain interrogatories.  The Plaintiffs contend that the interrogatories exceed the number permitted in the Scheduling Order if their various subparts are counted as discrete questions.  The Magistrate Judge found that the subparts were "factually and logically related to and subsumed within the primary question," and thus, were properly excluded from the count.  *Citing Kendall v. GEX Exposition Services, Inc.*, 174 F.R.D. 684, 686 (D. Nev. 1997).

The Plaintiffs' Objections do not specifically address any particular factual or legal flaw in the Magistrate Judge's reasoning.  They merely complain that "If this ruling is correct, Rule 33 is essentially meaningless when it instructs parties to count subparts."  In the absence of a specific assignment of error to a specific factual or legal finding by the Magistrate Judge, the Court deems the Plaintiffs to have waived any actual objections to the ruling.

are **OVERRULED** and the Magistrate Judge rulings to which they are directed (**# 114, 122, 132**)

are **AFFIRMED**.  The Plaintiffs' Motion to Stay depositions (**# 164**) is **DENIED**.

    Dated this 15th day of July, 2015.

                        **BY THE COURT:**

                        Marcia S. Krieger
                        Chief United States District Judge